EXHIBIT 2



# EMPLOYMENT AGREEMENT

Princess Cruise Lines, Ltd.

# PRINCESS CRUISE LINES LTD. ("Company")
# EMPLOYMENT AGREEMENT

| Surname, Forename (hereafter "Employee") | | Date of Birth |
|---|---|---|
| Place of Birth | | Employee ID # |
| Confirmed Rank | | Job Rank (hereafter "Position") |
| Guaranteed Monthly Wage | Eligible for Participation in Discretionary Fleet Gratuity Pool? | |
| | ☐ Yes    ☐ No | |
| Excess Overtime Rate (calculated on basic wage element) | Excess Overtime Paid for Monthly Hours Worked Over? | |
| | ☐ 390 Hours    ☐ 330 Hours | |
| Annual Leave Calculation (calculated on consolidated monthly hours) | Joining Date | Disembarkation Date |
| days per month | | |

## THIS IS AN IMPORTANT LEGAL AGREEMENT.
## READ IT CAREFULLY BEFORE SIGNING.

Employee acknowledges his/her responsibility to read this Agreement, understand its contents, and adhere to all of its provisions. Employee understands and agrees that the Collective Bargaining Agreement ("CBA") between the Company and Unions attached hereto is incorporated into and made part of this Agreement and is binding on Employee and Company. Employee further agrees that the terms of the CBA are binding on him or her whether the Employee is, remains or ceases to be a member of the Unions. Employee agrees that employment with the Company constitutes an international commercial relationship with one or more foreign parties and that any and all disputes of any kind or nature whatsoever between Employee and Company shall be resolved by binding arbitration in Bermuda and governed exclusively by the laws of Bermuda without regard to principles of conflicts of law, as set forth in Article 14 of the attached CBA.

Employee is not signing this Agreement under duress of any kind. Employee acknowledges that he/she has had the opportunity to examine the Agreement and CBA and seek any advice on it before signing. Employee affirms that he/she accepts and will abide by each and every provision of this Agreement, which includes all the terms set forth in the attached CBA including, but not limited to, the Guaranteed Monthly Wage, Governing Law and Arbitration provisions contained therein. Employee acknowledges and accepts that the Guaranteed Monthly Wage includes all or some overtime and all or some of pool shares for eligible employees, as set forth in Article 4. In addition, Employee agrees to abide by all other written or oral rules, regulations, policies and procedures of Company and/or the Affiliated Companies and/or any vessel on which he/she is assigned, whether set forth in this Agreement or elsewhere.

The parties agree that this Agreement is entered into in Bermuda, the country where Company is registered. Employee agrees to receive this Agreement in printed or electronic form and that an electronic scan, copy or facsimile of this Agreement and its attachments shall be as valid as the original and that Employee has received a full copy of this Agreement and the attached CBA consisting of 30 pages. Employee agrees that Company's retention of a paper or electronic copy of this Agreement only shall be deemed conclusive and irrefutable evidence that Employee received and signed this Agreement.

Signed: _____ on _____
                           *Signature*                                    *Date*

Print Name: _____

Signed: _____    Printed Name: ___Christopher Kay___
              For Princess Cruise Lines, Ltd.

# Table of Contents

**COLLECTIVE BARGAINING AGREEMENT GENERAL PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE 1**      Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE 2**      Vessel Assignment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE 3**      Duration and Termination of Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ARTICLE 4**      Hours Worked, Wages, Overtime and Other Pay  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARTICLE 5**      Service in Case of Emergency; Safety and Security of the Vessel. . . . . . . . . . . . . . . . . . . . . . . 6

**ARTICLE 6**      Repatriation Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**ARTICLE 7**      Health Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**ARTICLE 8**      Health, Accident and Death Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**ARTICLE 9**      Discipline, Complaints, Duties and Code of Conduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**ARTICLE 10**     Illegal or Unauthorized Drugs and Alcohol, Contraband, Zero Tolerance to Crime . . . . . . . . . . . . 11

**ARTICLE 11**     Crew's Effects: Loss, Damage, or Abandoned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**ARTICLE 12**     Personal Information Consent; Confidential and Proprietary Information;
                   Use and Display of Likeness; Work for Hire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**ARTICLE 13**     Internet Use and Social Media Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**ARTICLE 14**     Governing Law, Arbitration, Venue and Resolution of All Claims,
                   Controversies or Disputes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**ARTICLE 15**     Limitation on Representative Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**ARTICLE 16**     Integration of Terms, Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**ANNEX I**        The Company Code of Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**ANNEX II**       Onboard Complaints Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**ANNEX III**      Dress Code: Appearance, Personal Cleanliness And Hygiene . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**ANNEX IV**       Policy Against Harassment and Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# COLLECTIVE BARGAINING AGREEMENT
# GENERAL PROVISIONS

This Collective Bargaining Agreement ("CBA") is made between Princess Cruise Lines, Ltd (hereinafter referred to as "Company"), Par La Ville Place, 14 Par La Ville Road, Hamilton, HM JX, Bermuda, and the employees' trade union organizations Federazione Italiana Transporti-CISL ("FIT-CISL") and Federazione Italiana Lavoratori Transporti-CGIL ("FILT- CGIL") (hereinafter referred to as "Unions") and is effective from the 1st day of May in the year 2017. This CBA will be automatically renewed on a yearly basis, unless cancelled by Company or Unions with at least three months notice prior to expiration. The terms of this CBA may be amended at any time by mutual agreement between the Company and Unions and such amendments shall be agreed to in writing, signed by the Company and Unions and incorporated into this CBA.

The provisions of this CBA shall apply to all seafarers (hereinafter referred to as "Employees") excepting those employed on an alternative trade union agreement, embarked in the name and on behalf of the Affiliated Companies on board the Company's ships or those of Carnival plc, trading as P&O Cruises, Australia 15 Mount Street, North Sydney NSW 2060

The Company recognizes the Unions as the sole and exclusive collective bargaining representatives of Employees covered by this CBA. Company shall pay all applicable required fees and contributions to the Unions on behalf of the Employees covered by this CBA in accordance with the terms of the relevant organization.

# ARTICLE 1
# Defined Terms

As used herein the following definitions shall apply:

**"CBA"** shall mean this Collective Bargaining Agreement which is fully incorporated into and is made a part of the Employee's Agreement.

**"Agreement"** shall mean the Employee's individual terms of employment with the Company as set forth in the Princess Cruise Lines Ltd Employment Agreement to which this CBA is attached. In the event of any inconsistency or conflict between the Agreement and the CBA, the CBA shall control.

**"Affiliated Companies"** shall mean and include all legally related entities, including without limitation, Carnival Corporation, Carnival plc, and any of their brands.

**"Company"** shall mean Princess Cruise Lines Ltd., a Bermuda Company.

**"Companies"** shall mean the Company and Affiliated Companies and shall include all employees, directors and officers of Companies, vessels owned or operated by Companies, and shipboard officers, crew, medical staff and all other personnel employed in any capacity on such vessels.

**"Employee"** shall mean the individual named in the Agreement, and the provisions of such Agreement and of this CBA shall be binding upon the Employee's heirs, successors and personal representatives.

**"Normal Scheduled Term Onboard"** shall mean the period of time which the Company has scheduled the Employee to work aboard a particular vessel pursuant to the Agreement.

**"Parties"** shall mean Employees covered by this CBA with the Unions and Companies.

# ARTICLE 2
# Vessel Assignment

The Company reserves the right to transfer Employee to any Company vessel, or any vessel covered under its manning agreements, and Employee agrees to provide services while onboard any vessel to which he/she may be appointed.

# ARTICLE 3
## Duration and Termination of Agreement

**A. DURATION:** Unless otherwise provided by law, government-mandated contract or this CBA, these terms become effective the day the Employee is entered onto the ship's crew list up to and including the day when the Employee is shown on the crew list as disembarking, or the employment relationship is otherwise terminated, as provided for elsewhere in this Agreement.

**B. TERMINATION UPON NOTICE:** Notwithstanding any other provision contained herein, Employee's employment with the Company is terminable immediately at the will of either the Company or the employee, with or without cause, upon 30 days written notice and the Unions will be notified and given an opportunity to review the case if this notice is exercised by Company. In cases where Employee provides 30 days notice, Company has the right to replace Employee at any time during the 30 days and will be responsible to pay wages only through the last day Employee actually works.

**C. TERMINATION WITHOUT NOTICE:** In the event Employee breaches any term of this CBA or violates any rule, regulation or policy of the Company, including but not limited to those acts of Gross Misconduct listed in the Company Code of Conduct (Annex I hereto), the Company may terminate Employee's Agreement without notice. The Company also has the right to terminate Employee's Agreement without notice immediately upon the Employee's unscheduled disembarkation from the assigned vessel for any reason, including but not limited to personal leave, illness, injury, or incapacity, for more than 24 continuous hours.

**D. TERMINATION WITHOUT NOTICE BUT WITH WAGES:** Employee may terminate Employee's Agreement without notice or penalty if the ship in which he/she is serving (1) is detained for non-compliance with any of the provisions of SOLAS, the Load Line Convention, the STCW Convention, MARPOL, or the Maritime Labour Convention and remains so detained for 30 days; (2) is arrested and remains under arrest for 30 days; (3) is about to sail into a warlike area as defined by the ship's insurers and Employee does not consent to go; or (4) Employer is not able to fulfill its legal or contractual obligation to Employee as a result of insolvency, sale of ship, or similar cause. In addition, the Company may terminate the Employee's Agreement without notice if the ship has been laid up for a continuous period of 30 days, is sold or is lost. For terminations under this Section D, Employee is entitled to two months wages at the rate of his/her basic rated pay and to the amount of paid leave accrued, if any, during his/her period of service onboard to the date of termination.

**E. TERMINATION UPON DESERTION:** Employee's employment ceases immediately if he/she deserts the vessel. Desertion is defined as failing to join the vessel as scheduled, leaving the vessel without permission, and/or failing to sail with the vessel upon any scheduled departure. If Employee fails to report to the assigned vessel as scheduled, no wages or other benefits shall be due from the Company. If desertion occurs after being entered onto the vessel crew list, the date of desertion will be taken as the date of cessation of employment. In any such case, the Employee shall indemnify the Company in every respect against loss, damage, expense, fine and death or disability claims or any other claims arising as a result of, relating to or connected with such desertion.

**F. TERMINATION FOR UNFITNESS:** In the event the Company determines, in its sole discretion, that Employee is or has become unable or unfit to perform all the usual work in the position for which he/she was hired due in whole or part to illness, injury or incapacity, Employee's Agreement shall automatically terminate.

**G. TERMINATION UPON RETIREMENT:** The Company has established a retirement age of 65. Employee agrees that Employee's Agreement shall automatically terminate at the end of the Normal Scheduled Term on Board during which the Employee turns 65.

# ARTICLE 4
## Hours Worked, Wages, Overtime and Other Pay

**A. HOURS WORKED:** Working on a ship often involves working lengthy work hours 7 days a week. To compensate for this, Employees are given extended periods of leave between Agreements.

**B. RECORDING OF HOURS:** Employee is responsible for recording each day their hours of work and rest. The Company relies upon each Employee to accurately report and verify in writing or electronically all hours worked and/or rested during each month, and Employee agrees to be responsible for ensuring the accuracy of any time records he/she signs and/or approves. The Employee's written submission or electronic approval of his/her hours shall be deemed an admission by Employee of the accuracy of the hours recorded and/or approved and a waiver of any right to claim compensation for hours in excess of those recorded and/or approved.

**C. WAGE DETAILS:** Employee hereby accepts employment with the Company in consideration for the Guaranteed Monthly Wage (inclusive of overtime) and other eligibilities if any as set forth in the Agreement and in this Article 4. Other than as specified in such terms, the Company makes no promise, guarantee or commitment, and Employee agrees he/she does not expect or rely upon payment by the Company of any compensation beyond the Guaranteed Monthly Wage.

**D. GUARANTEED MONTHLY WAGE:** Employees receive a Guaranteed Monthly Wage for each calendar month worked. Except as otherwise specified herein, this Guaranteed Monthly Wage includes all the compensation Employee will receive for all hours worked including, without limitation, overtime hours and for working on Saturdays, Sundays and Bermuda public holidays, whether locally, nationally or internationally observed. It may also include all or a portion of any amount the Employee is eligible to receive from any gratuity pool (if applicable to Employee's position as noted in the Agreement). Employee's Guaranteed Monthly Wage is a partially consolidated monthly wage and already includes payment for overtime hours up to a total of either 330 or 390 hours per month (depending on position), as well as pay for travel days and annual leave as indicated on the signature page of this Agreement. The calculation of the Guaranteed Monthly Wage is neither increased nor decreased based on the specific itinerary of any vessel, time zone changes experienced by the vessel, or whether the vessel crosses international date lines.

**E. EXCESS OVERTIME HOURS:** It is the intention and strict policy of the Company to pay all Employees for all hours worked. It is understood and agreed that Employee is not guaranteed and does not have any right to work or to be assigned to work excess overtime hours. All hours worked for which excess overtime is claimed must be authorized in advance of working such hours. Employee is entitled to receive payment for excess overtime hours worked as follows:

1. For "330 hour" Employees, excess overtime hours are paid in addition to the Guaranteed Monthly Wage when the Company's records show that the total hours actually worked during the month exceed eleven (11) hours per day multiplied by the total days worked in the month. Thus, for example, all hours worked in a thirty (30) day month in excess of three hundred and thirty (330) hours are compensated at the excess overtime hourly rate specified in Employee's Agreement. For periods worked of less than one month, excess overtime hours are paid when the Company's records show that the total hours actually worked exceed eleven (11) hours per day multiplied by the number of days worked. For example, all hours worked in excess of one hundred and ten (110) during a period of ten days onboard during a month would be paid at the excess overtime hours' rate.

2. For "390 hour" Employees, the guaranteed pay for these positions already includes compensation for all anticipated overtime that could be worked. Accordingly, the Company will not assign, authorize or approve excess overtime to 390 hour Employees except in exigent circumstances and only if authorized by the vessel's Captain. 390 hour Employees acknowledge and agree not to work, and therefore not to claim compensation for any excess overtime hours, without express instructions from the vessel's Captain or head of their department. In the event a 390 hour Employee is approved for and required to work excess overtime hours, excess overtime hours are paid in addition to the Guaranteed Monthly Wage when the Company's records show that the total hours actually worked during the month exceed thirteen (13) hours per day multiplied by the total days worked in the month. Thus, for example, all hours worked in a thirty (30) day month in excess of three hundred and ninety (390) hours are compensated at the excess overtime hourly rate specified in Employee's Agreement. For periods worked of less than one month, excess overtime hours are paid when the Company's records show that the total hours actually worked exceed thirteen (13) hours per day multiplied by the number of days worked. For example, all hours worked in excess of one hundred and thirty (130) during a period of ten days onboard during a month would be paid at the excess overtime hours' rate.

3. For "330 hour" or "390 hour" Employees who are approved to and do work excess overtime, excess overtime will be paid at the hourly rate specified in the Agreement. In the event no rate is specified, the excess overtime rate shall be as set forth in the union approved wage scales. The excess overtime rate in all cases is at or above 1.25 times the hourly rate of the Basic Pay element of partially consolidated pay  as set forth in the wage scales.

F. **PAYMENT OF WAGES:** Except as otherwise provided or agreed in writing, wages accrue from and including the day the Employee is entered onto the vessel crew list up to and including the day when the Employee is shown on the vessel crew list as disembarking, or the employment relationship is otherwise terminated. Wages are paid monthly in arrears (by the fifth business day of the month following the month in which the wages were earned) according to the Company's records, including pay for the month that Employee disembarks. At disembarkation, any unpaid balance not paid in the next month's pay will carry a 20% rate of interest per annum until paid, unless not required pursuant to the provisions of Merchant Shipping (Seafarers Wages) Regulations 2013. Compensation for periods of less than one month is pro-rated on the basis of one/thirtieth for each day worked. Employee expressly consents to and authorizes the Company to arrange for, in its sole discretion, payment of wages by cash, check, negotiable instrument, wire transfer, direct deposit or any other commercially available method for the efficient, practical and prompt payment of wages earned, including, without limitation, deposit of wages into an account to secure a payroll, debit or stored value card, or any other account for the benefit of the Employee as may be arranged by the Company from time to time, or any other method or manner of payment agreed in writing between Company and Employee or set forth in any other controlling government-mandated contract.

G. **DISCRETIONARY  FLEET GRATUITY POOL:**  The Agreement specifies whether Employee is eligible to participate in the Company's Discretionary Fleet Gratuity Pool ("Fleet Pool"). Employee is only eligible to participate in the Pool if "YES" is checked on the Agreement. It has been the Company's experience that passengers often wish to recognize and reward staff for working successfully to make the cruise experience enjoyable and meeting or exceeding our Company-wide standards of excellence. Accordingly, during each voyage of each Vessel a voluntary contribution by each fare-paying passenger will typically be suggested for that purpose. Passengers are not obligated to make a contribution or to adhere to the Company's suggested guidelines for such a contribution. Nonetheless, to the extent passengers follow the suggested contribution guidelines in whole or in part or otherwise contribute gratuities, each and every Employee agrees that any such resulting contribution is not his personal wage but rather a contribution to the Fleet Pool. All participating Employees shall share in the resulting passenger contributions from each voyage according to his/her allocated points. All participating Employees understand and accept that their individual shares are based entirely on the results of each voyage of each Vessel and the satisfaction of passengers whose contributions create the Pool. Other than as stated below, the Company is in no way liable to make up any difference between the total of the suggested contributions to the Fleet Pool and the actual contributions. The solicitation of compensation of any kind by Employees from passengers, either for individual remuneration or contributions, is strictly prohibited.

The resulting passenger contributions delivered to the Company from each voyage shall be tallied on a fleet wide basis in order to determine each eligible Employee's share of the total Fleet Pool. Employees who might be eligible for Fleet Pool shares include persons working on any Company vessel in the Accommodation and Food Service Departments. Positions participating in the Fleet Pool on each ship will be allocated points for the work performed on each voyage. Accommodation staff will be allocated points based on the number of passengers serviced by crewmember. Food Service staff will be allocated points according to the number of shifts worked. The Fleet Pool amount will include resulting contributions from all voyages completed by all Vessels over a rolling 180 day period, with each share being based on the Fleet Pool total for the 180 day period immediately prior to payment of that share. Payments to eligible Employees at the end of each voyage will be made based on the dollar point value times the number of points allocated to each participant and are based entirely on the results of each voyage. The dollar point value is determined on a daily basis by dividing the total passenger contributions to the Fleet Pool by the total points allocated to participants in the same rolling 180 day period.

Notwithstanding the above, each Employee agrees that the Company reserves and has the exclusive right to determine, in its sole discretion, the eligibility and number of total Employees to receive Fleet Pool shares and the share of the Fleet Pool amount allocable to each eligible Employee. From time to time, in the discretion of the Company, Employees who are Fleet Pool participants may be asked or may volunteer to work additional hours, and/ or to assist other Employees working in the Accommodation and Food Services Departments. All Employees agree that compensation for all such hours will be paid to those eligible from the Fleet Pool.

Since passenger participation in the Fleet Pool is strictly voluntary, the Company cannot predict and does not guarantee the size of the Fleet Pool amount or the amount of money any eligible Employee may be entitled to receive from the Fleet Pool arrangement. Each Employee understands and agrees that funds contributed by passengers and included in the Fleet Pool amount are net of any credit card fees and/or charges incurred to facilitate passenger

contributions. Each Employee further understands and agrees that none of the contributed funds shall be deemed wages of any Employee under any circumstances, except and only to the extent of each individual Employee's agreed share, if any, and only to the extent the Fleet Pool share is used to meet the Guaranteed Monthly Wage.

Employees will only be entitled to Fleet Pool distributions through the last day of employment.

H. **BONUSES, COMMISSIONS and OTHER REMUNERATION:** From time to time the Company may establish other programs involving monetary or other benefits above or apart from those specified in this CBA, including without limitation bonuses, commissions, incentives, service charges and the like. Employee understands and agrees that any such program or benefit is at the sole discretion of the Company, with or without notice, as to creation, implementation, entitlement, amount, timing, form, continuation and/or elimination. Employee therefore understands and agrees that no such program or benefit forms a required part of the contractual wages or pool shares payable under this CBA. Company makes no promise whatsoever that Employee is or shall be eligible for any program or benefit described in this Section.

I. **VISAS:** The Company shall reimburse the cost of necessary visas once the seafarer is employed (securing a US C1/D visa is a pre-employment requirement therefore only renewals are eligible for reimbursement) so long as Employee presents a valid, original receipt upon joining his/her next ship. The Company does not reimburse any expenses associated with securing necessary visas, unsuccessful visa applications, or visas required for optional activities such as shore leave.

J. **SICK WAGES:** Where the Company is obligated to pay any wages as the result of Employee being sick or injured, such sick wages shall be paid at the rate of the Guaranteed Monthly Wage and shall not include any other components.

K. **WAGE GRIEVANCE PROCEDURE:** Employee waives any claim for wages or compensation of any kind, unless Employee first provides written notice pursuant to the following grievance procedure within one hundred eighty (180) days after the date on which Employee receives his or her wages or other compensation that are in dispute. Any wage grievance notice shall be sent by certified mail to Compensation Department, Princess Cruise Lines Ltd., Par La Ville Place, 14 Par La Ville Road, Hamilton, Bermuda HM JX. Such written notice must specify the exact amount of wages or other compensation claimed to be owed, the specified period for which said amounts are claimed to be owed, the date on which the Employee alleges that the Company was required to pay the wages or other employee compensation, and the basis for the claim.

Timely and properly submitted claims will be adjudicated by the Company. If the Employee does not dispute the determination reached in this grievance process within thirty (30) days of the determination, then the determination shall be final and binding. If the Employee desires to dispute the Company's determination, then the Employee must timely pursue his or her claim through arbitration, before the Company's determination becomes final and binding. The procedures for such arbitration shall be as set forth in Article 14 herein.

# ARTICLE 5
# Service in Case of Emergency; Safety and Security of the Vessel

Employee agrees to work any hours necessary in case of emergency directly affecting the immediate safety or security of the vessel, passengers and crew, of which the Captain shall be the sole judge, or for safety or onboard drills and courses, or to perform work required to give assistance to other vessels or persons in immediate peril.

Employee agrees to wear the safety clothing/equipment supplied by the Company/vessel and/or as instructed by the Company/vessel. When so required by the Company, Employee will undertake training and take any necessary examinations to obtain required certificates and undertake any other training for safety or job-related qualifications which may be required by the Company. Employee agrees to attend all safety and emergency drills, train in the use of firefighting and lifesaving equipment, evacuation procedures, vessel searches, man overboard procedures, etc., at intervals to be determined by the vessel's Captain, Officers and those acting on their instruction in accordance with applicable law and regulatory requirements.

Whenever Employee is involved in an accident, sustains injuries, or becomes aware of any accidents, or injuries to

another employee or passenger, or becomes aware of or witnesses any condition aboard the vessel that may be unsafe, Employee shall immediately report to his or her supervisor or the vessel's Safety or Security Officer any such occurrence or condition. Employee acknowledges that failure to report an accident, injuries or dangerous conditions could prejudice Company's ability to properly investigate and document the accident, pay proper compensation if due and correct a deficiency, if one exists.

# ARTICLE 6
## Repatriation Expenses

A. **WHEN REPATRIATION IS PAID:** Repatriation shall be provided as set forth in this Article to the home airport designated by the Company for each Seafarer ("Repatriation Airport"). Unless agreed otherwise in writing, transportation expenses incurred for repatriation from the vessel back to the Repatriation Airport designated by the Company at the end of Employee's employment are met by the Company, in a manner and method to be determined in the sole discretion of the Company, if:

1. Employee completes his or her Normal Scheduled Term Onboard;

2. Company terminates Employee's employment on medical or unfitness grounds or disembarks Employee for shoreside medical treatment;

3. Employee's employment is terminated in accordance with the provisions of Article 3.B or 3.D;

4. Company or Employee terminates the Employee's employment because the vessel is headed to a bona fide war zone; or

5. Employee terminates pursuant to the Company's Compassionate Leave Policy.

B. **WHEN REPATRIATION IS NOT PAID:** Employees will be and agree to be responsible for their own repatriation costs, including but not limited to airfare, and may be precluded from future employment with the Company if:

1. Employee is terminated for Gross Misconduct or incompetence;

2. Employee requests "own will" disembarkation before completing their Normal Scheduled Term Onboard; or

3. Employee deserts his/her employment.

In the case of an Employee who is dismissed from employment on the grounds of Gross Misconduct as set forth in Annex I of this Agreement, should the Employee fail or refuse to pay for his/her own repatriation, **Employee agrees his/her last payment of wages will be less the amount of such repatriation expenses up to the amount of one month's Guaranteed Monthly Wage.**

C. **PROBATIONARY PERIOD:** For Employees sailing on their first employment assignment with the Company, he/she agrees that the initial 90 days on board shall be considered as a probationary period. Employees whose employment is terminated by the Company during the probationary period are entitled to repatriation expenses and wages until the date of signing off the crew list, plus 14 days in lieu of notice, unless the Employee's employment is terminated for Gross Misconduct. Employee agrees to be responsible for paying his/her own repatriation expenses if terminated by Company during the probationary period for Gross Misconduct, or if the Employee terminates his/her own employment other than for proven medical necessity or with sufficient notice.

D. **ALTERATIONS OR DEVIATIONS PROHIBITED:** Employees traveling on a Company issued ticket for both joining and leaving a vessel are not permitted to make alterations or deviations from the flight schedule at any point before or during the itinerary, under any circumstances. Additional costs involved in the joining or repatriation of an Employee, where the Employee's actions may have caused the Company to rebook flights, are to be borne by the Employee.

# ARTICLE 7
## Health Requirements

Before commencing employment on a Company vessel, Employee agrees to accurately and fully complete a Company medical fitness questionnaire and submit to and pass a physical examination in accordance with the Company medical standards by an independent medical doctor acceptable to the Company, as evidenced by a seafarer's medical fitness certificate in a form acceptable to the Company valid for the duration of employment. Non-disclosure or falsifying information on a medical fitness certificate is grounds for disciplinary action, up to and including discharge from the vessel, and may also constitute grounds for denial of health, accident, medical, death, contractual and/or any other benefits. A completed Health Declaration is required for all joining crew. Employees without the appropriate documentation may be prevented from joining a vessel. Until such time as Employee is entered onto a vessel crew list to commence work and produces a valid medical fitness certificate, any offer of employment is considered conditional. Employee agrees to be vaccinated or take any other health precautions as may be required by the Company or the health authorities of the countries visited by the vessel, and failure to comply with this requirement may result in the denial or termination of employment.

# ARTICLE 8
## Health, Accident and Death Benefits

**A. GENERAL.** The Company provides a physician and/or nurse onboard to assist Employees with medical needs and emergencies. Company does not provide medical care, reimbursement or any related benefits for (a) preexisting conditions, including those that manifested prior to signing the Agreement or being entered onto the vessel crew list; (b) medical care for incurable or permanent conditions; (c) maintenance medications or monitoring for chronic conditions; (d) conditions caused by the Employee's willful misconduct including, without limitation, the short or long term effects of intoxication or drug use, and sexually-transmitted diseases; (e) conditions that were not disclosed or were concealed or misrepresented to the Company; or (f) conditions arising after the Employee is repatriated.

**B. MEDICAL BENEFIT.** The provisions of this Article apply except to the extent modified by any other controlling government-mandated contract governing the Employee's employment. An Employee who requires medical care for injury or illness during the period from the date he/she is entered on the vessel crew list to the date when he/she is repatriated shall, except as otherwise provided herein, be entitled to curative medical treatment (including hospitalization) at the Company's expense until the sick or injured Employee has recovered, or until any sickness or incapacity has been established to be of a permanent nature or until the seafarer is able to claim medical benefits available to him/her under a scheme of compulsory sickness insurance, accident insurance or other scheme available in his/her country of domicile, whichever comes first. An Employee disembarked for such medical reasons will receive either food and lodging similar to that provided onboard, or US$12.00 daily allowance, at the Company's discretion until the Employee returns to his/her country of domicile or for 16 weeks from the date of injury or the commencement of the illness, whichever is earlier. Employees are not entitled to any food or lodging or daily allowance after they have been repatriated. Employee must submit valid medical reports of continuing curative treatment from their treating doctor at least monthly, or more frequently if directed by the Company. Medical reports should be submitted to the Company at Princess Cruise Lines Ltd., Health Services Department, 24200 Magic Mountain Parkway, Santa Clarita, CA 91355. Employee further hereby agrees to authorize the Unions, the Company or the Company's designated representative(s), in the event of any claim or allegation of injury or illness to obtain and receive all medical or employment records, including without limitation treatment, examination, billing, personnel files and/or any and all other information in order to properly investigate the cause, extent and/or treatment of the incident or illness and/or to evaluate the damages sustained, if any. All medical care provided at the Company's expense, the provision of or allowance for food and lodging, and any sick wages due shall be subject to the following conditions: a) the Employee shall comply with all instructions of the Company, its representatives or the manning agent at the port where he/she is landed subject to medical approval; and b) the Employee shall report upon arrival at his/her home to the Company, its representatives or the manning agent as soon as possible; and (c) the Company will only reimburse medical costs that are reasonable, necessary and customary for the care rendered. Additionally,

Employee agrees to be examined, at the Company's expense, by doctors designated by the Company in specialties relevant to any medical claim Employee makes and to submit to an examination under oath, including producing all relevant documents requested by the company before such examination. Failure by Employee to submit medical records and reports at least monthly, to sign any requested medical records release, to appear for any requested medical examination, or failure to submit to an examination under oath within 15 days after request of same shall constitute willful misconduct on the part of Employee and shall constitute a breach of this CBA by Employee and a waiver for any claim for further medical benefits.

C.  **SICK WAGES:** Where an Employee is unable to work due to an injury or illness for which the Company is liable to pay the costs of medical care as provided above in Article 8(B), the Company shall pay sick wages from the date of the injury or commencement of the illness until the Employee is recovered, until any sickness or incapacity has been established to be of a permanent nature, or until 16 weeks from the date of commencement of the illness or date of the injury, whichever comes first.

D.  **DEATH BENEFIT.** Except as otherwise provided in any other controlling government-mandated contract governing the Employee's employment, if an Employee dies as a result of an accident during the period of employment during which these Terms are applicable under Article 3 (A) (but excluding death occurring, in whole or part, from the Employee's negligence, willful misconduct, suicide or presumed suicide, natural causes, disobedience of orders or instructions from superior officers or management, any breach of the Code of Conduct, or accidents occurring during non Company assigned activities off the vessel), the sum of USD $50,000 is payable to the next-of-kin registered with the Company plus USD $7,000 to each natural or legally adopted child of the Employee who is under the age of 21 at the time of the Employee's death, subject to a maximum of 4 children ("Death Benefit"). In the event the deceased leaves more than four (4) children who otherwise qualify for a USD $7,000 payment, then each such child will receive from the Company a quotient equal to USD $28,000 divided by the total number of such children. If an Employee dies as a result of an accident caused by the Employee's own negligence, suicide or presumed suicide, or natural causes during the period of employment, the sum of $5,000 is payable to the next-of-kin registered with the Company. These Death Benefits are voluntary payments made by the Company to Employee's next of kin. In the event Employee's next of kin or other legal representative pursues any legal claim or action against the Company relating to or arising from Employee's death, such voluntary payment shall be waived or, if already made, shall be a setoff against any amount otherwise judged to be owed by the Company.

E.  **BURIAL EXPENSE:** In cases where a death occurs during the period of this Agreement, the Company will pay the essential costs of burial and a sum of $1,000 toward local funeral expenses.

F.  **DISABILITY BENEFIT.** Except as otherwise provided in any other controlling collective bargaining agreement or government-mandated contract governing the Employee's employment, an Employee who suffers injury as a result of an accident during the period of employment under these Terms as set forth in Article 3 (A) (but excluding injury occurring, in whole or part, from the Employee's negligence, willful misconduct, attempted suicide, natural causes, disobedience of orders or instructions from superior officers or management, any breach of the Code of Conduct, or accidents occurring during non Company assigned activities off the vessel) and whose ability to work is permanently reduced as a result thereof, shall be eligible for compensation for permanent disability ("Disability Benefit"). The amount the Company will pay as a Disability Benefit shall be determined by the degree of permanent disability as determined by a doctor appointed by the Company. If a doctor appointed by the Employee disagrees with the assessment, a third doctor may be agreed jointly between the Company and the Employee, or by the two appointed doctors. If the Company and Employee cannot agree on a third doctor, the Parties agree that the percentage degree of permanent disability shall be calculated as the mean average of the findings of (i) the Company appointed doctor and (ii) the Employee appointed doctor (the "Final Percentage"). The third doctor or if no agreement, the Final Percentage shall be final and binding on both the Company and the Employee. Based upon the degree of permanent disability, compensation will be paid by the Company to the Employee, in exchange for the Employee's signing a full release of the Company and its vessels, officers, staff and crew from all claims whatsoever arising from or related to the injury, corresponding to the degree of permanent disability as set out in the table below:

| Percent Degree of Permanent Disability (%) | US Dollar Payment To Employee |
|---|---|
| 100% | $50,000 |
| 75% | $37,500 |
| 50% | $25,000 |
| 25% | $12,500 |
| 10% | $ 5,000 |

Compensation for disabilities based on percentages assessed between the above categories, including less than 10% disability, shall be the product of the percent of disability times USD $50,000. Employee's acceptance of the Disability Benefit shall be deemed as a complete waiver of any other claim or right the Employee may have against the Company. Employee shall have the right to waive payment of the Disability Benefit if he or she wishes to pursue other legal remedies against the Company. Any claim for Disability Benefits must be made by submitting a demand for payment of the Disability Benefit in writing no later than 150 days after the accidental injury or illness giving rise to the claimed disability.

G. **MATERNITY BENEFIT:** In the event that Employee becomes or learns she is pregnant while signed on to the crew list, Employee must advise the onboard medical team as soon as the pregnancy is confirmed. As failure to do so may endanger the health and well-being of mother and child, lack of disclosure may result in disciplinary action. Employees who are  pregnant may remain working onboard a vessel until 24 weeks as long as they are able to maintain their normal job duties and have the approval of the shipboard medical doctor.  Any medical care that can be provided by onboard medical staff will be provided without charge. As our ships generally do not have specialized equipment for prenatal care and our shipboard physicians do not specialize in obstetrical care, most prenatal care will need to be obtained off of the vessel. The Company will provide assistance in identifying care providers but the cost of the care off of the ship is the responsibility of the Employee.

A pregnancy is not considered an injury or sickness and Employee is not entitled to maintenance, cure or sick pay benefits when signing off due solely to a pregnancy. Company shall pay the costs of repatriation so long as Employee timely informed the onboard medical team of the pregnancy.

Employees who are repatriated for the birth of a child are entitled to six weeks maternity leave pay at their guaranteed monthly wage, upon presentation of the certificate of birth.

If Employee advises Company within two years following the birth of her child that she wishes to return to sea, she shall afforded priority in filling a suitable vacancy in the same or equivalent position should such vacancy be available.

# ARTICLE 9
## Discipline, Complaints, Duties and Code of Conduct

Employee acknowledges receipt of a copy of the Company's Code of Conduct (which stipulates certain circumstances under which Employees may be disciplined and/or their employment terminated), as well as Company's Dress Code, Harassment and Non-Retaliation Policy, and onboard Complaints Procedure. Employee agrees at all times to follow and be bound by the Code of Conduct, Dress Code, Harassment and Non-Retaliation Policy and onboard Complaints Procedure. Employee further agrees to perform all orders and assignments as delegated by the vessel's Captain and/or authorized Officers or Supervisors relating to the Employee's normal duties including, but not limited to, safety and security duties. Employee agrees at all times to cooperate fully in all investigations of any nature undertaken or requested by the Company, the ship, or its or their owners, operators, officers or employees, or any governmental authorities, including providing any requested witness statements or interviews. Employees committing criminal acts, or acts subjecting them to civil liability, will be subject to criminal or civil prosecution in any appropriate jurisdiction and also to immediate termination.

Employee acknowledges and agrees to abide by all corporate policies, whether specifically referenced herein or not, including the Code of Business Conduct and Ethics.

Employee acknowledges and agrees that the Company shall at all times retain the right and the ability to access Employee's quarters onboard the vessel, to monitor electronic or other communications, and to monitor or record certain areas of the vessel using video surveillance or CCTV at the Company's sole discretion.

# ARTICLE 10
# Illegal or Unauthorized Drugs and Alcohol, Contraband, Zero Tolerance to Crime

The Company has zero tolerance for the possession, use, purchase, sale, transfer or transportation of any form of illegal or unauthorized drugs or any type of drug paraphernalia, including prescription drugs prescribed to someone else, as well as rules limiting alcohol consumption and possession. Company also has zero tolerance for Employees who, while on board or ashore, operate any machinery or motor vehicle while under the influence of drugs or alcohol. Violation of these drug and alcohol policies constitute willful and gross misconduct, will result in immediate termination of employment, and may result in criminal prosecution in any jurisdiction which the ship visits and/or the flag state. Company does not provide legal counsel or other assistance to Employees arrested for these or other criminal offenses. Conviction for criminal offenses, including drug offenses, can result in lengthy prison sentences or the death penalty in some jurisdictions. The Company reports all suspected serious crimes to appropriate shoreside law enforcement agencies and cooperates fully with them in the prosecution of any individual who commits any criminal offense.

Employee hereby agrees and consents to have the vessel's Captains, Officers and those acting on their instruction, with or without notice, search the Employee, his/her baggage and/or personal effects at any location, and enter and search Employee's accommodation at any time and to seize any suspected stolen property, illegal or unauthorized drugs, alcohol or other contraband. Employee further agrees and consents to be tested either randomly, following any accident or marine incident, following any breach or suspected breach of the Code of Conduct, or otherwise for use of alcohol and/or drugs. Failure to comply with a request for any drug or alcohol test or the failure of such a test may lead to termination of employment.

# ARTICLE 11
# Crew's Effects: Loss, Damage, or Abandoned

Employees are encouraged to procure personal effects insurance or comparable protection adequate for their needs for situations not covered by the following provision.

In the event of loss or damage to Employee's personal property as a result of the wreck, loss, stranding or abandonment of the vessel, or as a result of fire, flooding or collision, Employee shall be entitled to recover from the Company reimbursement for actual loss up to a maximum of USD $3,000 per Employee. Except as stipulated above, Company shall not be liable under any circumstance for loss or damage to Employee's personal property. Reimbursement for loss of personal property is conditioned upon the submission of a written declaration sworn under oath to be true by the affected Employee which shall list any items lost or damaged and which attributes a reasonable value to such items. Submission of any false or exaggerated claim for reimbursement shall result in immediate termination of employment and all such claims are subject to verification by the Company. In no event shall Company be liable in any amount or sum whatsoever for negotiable instruments, electronics, cameras, cash or jewelry. It is the Employee's responsibility to take their belongings with them at the time of disembarkation. Items left behind without confirmed shipping arrangements paid for by Employee will be donated or destroyed after 45 days.

In cases of death onboard or disembarkation due to injury or illness, property left onboard will be itemized and, with the exception of items that are perishable or that are prohibited or illegal to transport, sent to the Employee or their next of kin.

# ARTICLE 12
# Personal Information Consent; Confidential and Proprietary Information; Use and Display of Likeness; Work for Hire

Employees may not photograph or film other Company employees, passengers, suppliers or vendors without their express permission. No pictures of Company employees, passengers, suppliers or vendors may be uploaded to the internet, including social media sites, without the express approval of all involved. No still or video cameras (including camera phones) are to be used in restrooms or anywhere else in the workplace where privacy would be expected.

Every Employee consents, as part of this CBA, to the use by Company or its licensees, without limitation, of that Employee's name, likeness, voice, indicia, country of citizenship and/or residency, along with information concerning the Employee's past, present or expected work schedule or deployment on the Companies' vessels, in marketing or other materials, whether in print, electronic, recorded, photographic, on the internet, or in any other form, now or hereafter devised, in any fashion or for any purpose, absolutely and forever, without further compensation.

Employee agrees to provide personal information (contact information, employment history, etc) in connection with employment with the Company and may also provide certain sensitive data (health, medical condition, dietary or religious restrictions, or gender) as well. Employee consents and agrees that the Company may (1) keep Employee's personal and sensitive data (2) use it in its business worldwide in accordance with its privacy and other policies (3) share it with affiliated/related companies, retained experts and the company's claims department and attorneys, and (4) transfer it and subject it to processing worldwide (including within the United States of America) provided the Company's safeguards are used.

Employee may become privy to information of a confidential and proprietary nature including, but not limited to confidential information about the Company's products, services, passengers, employees, shipboard accident or criminal investigations, and other internal matters that are not generally known to the public, as well as trade secrets, policies, practices or procedures which are enacted by the Company, the assigned vessel and/or related companies. This information is confidential and proprietary to the Company, and its disclosure to others could cause the Company irreparable harm. Employee agrees to hold this information in strictest confidence and not to directly or indirectly use or disclose any information that he/she acquires during employment to or for Employee's use or benefit or that of any outside person or entity including, but not limited to the Company's competitors, vendors, former passengers or any former Employee, or current employees, officers or staff without the Company's permission, except as necessary to fulfill Employee's job responsibilities on behalf of the Company. Employees are prohibited from acquiring internet minutes through use of passenger account information or use of passenger minutes.  Employee further agrees never to access, possess, copy, disseminate, or use any information whatsoever relating to any employees or former employees except as is necessary to fulfill Employee's job responsibilities. Employee agrees to use reasonable care to protect and safeguard any confidential information and keep it physically secure from inadvertent disclosure. When Employee's employment with the Company ends, he/she must return all confidential information to the Company. This obligation to preserve the Company's confidential information applies during Employee's employment and continues after his/her employment with the Company ends. Violation of this policy is grounds for discipline up to and including termination. The Company may also seek injunctive relief in the courts or take other legal action against anyone who misappropriates its confidential or proprietary information or threatens to do so. The provisions of this Article 12 shall remain in full force and effect and shall survive Employee's termination of employment from the Company.

In consideration for the Guaranteed Monthly Wage, Employee assigns and transfers to Company, its successors and assigns, absolutely and forever, all right, title and interest and copyright throughout the world in and to all work performed by Employee, inventions, ideas, work methods, designs or other intellectual property created by Employee during the term of this CBA.

# ARTICLE 13
## Internet Use and Social Media Policy

Access to the Internet through the Company network and/or Internet Café system onboard is a privilege and carries responsibilities reflecting legal and ethical use. Any type of Internet use such as but not limited to general browsing, downloads, uploads, and electronic mail must remain professional, respect copyright and fair use requirements as instructed by the Company, and must comply with this Internet Use and Social Media Policy.

**Policy**

While onboard, and even when using personal devices, employees are required to access the Internet only through the Company systems and mechanisms using hardware and protocols issued by the Company's Network Resources. Employees understand that they will adhere to established protocols to connect to the Internet, whether for business or authorized personal use, via resources provided by the Company to enable Internet access.

All messages sent and received (including personal messages), and all data and information stored / exchanged on the Company's electronic mail system, hardware allowing Internet access, voice mail system, any Company-provided equipment or Technology Resources (consisting of all electronic devices, media, peripheral devices, applications, software and means of electronic communications) are Company property regardless of the content. The Company reserves the right in its sole discretion to access, monitor and record all such equipment and Technology Resources at any time and for any reason, including without limitation computer files, electronic mail messages, voice mail messages, and Internet browsing history. Employees understand that they have no right or expectation of privacy with respect to any messages or information created, stored, or otherwise maintained or transmitted on the Technology Resources.

Notwithstanding the foregoing, Company will not monitor or seek to access any communications made to or from your personal computer or other electronic device unless necessary for the safety or security of the Vessel or any passenger or the protection of Company's equipment or systems. In such event, you will be notified that your personal computers are being or have been searched unless such notice would violate applicable law or jeopardize safety or security of persons, the Vessel or the Company's equipment or systems.

The Company respects your right to participate in online social networks, such as Facebook, Twitter, and YouTube, on your personal time and in your personal capacity. However, any online postings that mention the Company or your work at the Company must not improperly disclose any information that is not generally known to the public, or might otherwise violate any of the policies set forth in your applicable CBA or in any other Company policies. If you establish social media groups containing the word "Princess", "Carnival Australia", or "P&O Cruises, Australia", then it must be closed so that passengers and others cannot readily view any content. You must not use a Company e-mail address for any online postings or hold yourself out as speaking on behalf of the Company without the Company's express authorization in advance. If you mention the Company or its business, you should identify that you are an employee of Princess Cruises and that the views expressed are yours alone and do not represent the views of the Company. In addition, you must avoid any offensive, harassing, or defamatory content that could have adverse consequences for the Company, yourself or your colleagues. You must respect the privacy rights of your co-workers and abide by our Core Value "We Respect our Team".

Recognize that you are legally liable for anything you exchange, write or present online. Employees can be disciplined by the Company for commentary, deviation from established protocols/processes to connect to the Internet, content, or images that are defamatory, pornographic, proprietary, harassing, libelous, or that can create a hostile work environment.

# ARTICLE 14
# Governing Law, Arbitration, Venue and Resolution of All Claims, Controversies or Disputes

**IMPORTANT – THIS ARTICLE LIMITS EMPLOYEES AND COMPANY'S RIGHT TO PURSUE LITIGATION IN COURT AGAINST EACH OTHER AND AFFECTS IMPORTANT LEGAL RIGHTS. READ IT CAREFULLY. BY ACCEPTING EMPLOYMENT WITH COMPANY, EMPLOYEE UNDERSTANDS, AGREES TO AND ACCEPTS THE OBLIGATION TO ARBITRATE ANY DISPUTE AS FURTHER SET FORTH IN THIS ARTICLE 14. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A JURY TRIAL, AND WAIVE ANY RIGHT TO HAVE A COURT DETERMINE THE ENFORCEABILITY OF THE AGREEMENT TO ARBITRATE.**

As a rule, any grievances must be lodged onboard or directly with the Company. In the event that there is no satisfactory resolution of the Employee's grievance, Employee can refer to the Unions for further support. In the event the grievance is still not resolved, it must be referred to arbitration to the exclusion of any other legal or court proceeding as set forth below. Access to this grievance process does not extend any applicable statute of limitations for initiation of an action.

Any and all Employee Claims of any kind or nature whatsoever shall be resolved exclusively pursuant to the terms specified in this section or any controlling government-mandated contract (including but not limited to POEA contracts), if any.

In the absence of another controlling government-mandated contract containing a dispute resolution provision or procedure, the parties intend and agree that every conceivable claim, demand, dispute, action, suit, petition or controversy of any kind or nature without any limitation whatsoever that Employee may bring or assert against Companies or that Companies may bring or assert against Employee, regardless of where, when or how the incident or matters giving rise to such dispute occurs, are international commercial disputes and **shall be referred to and resolved exclusively by binding arbitration in Bermuda** pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958), 21 U.S.T. 2517, 330 U.N.T.S. 3, 1970 U.S.T. Lexis 115, ("the Convention"), to the exclusion of any other fora, in accordance with the Arbitration Act 1986 of Bermuda ("Arbitration Act"). The Company and Employee hereby further agree that any and all disputes whatsoever shall be governed exclusively in all respects by the laws of Bermuda, without regard to principles of conflicts of law and to the exclusion of any other law.

A.  **INITIATION OF ARBITRATION.** Both Employee and Company hereby waive personal service of any arbitration petition or papers and further stipulate that service of same shall be deemed effective either upon (a) personal service, (b) delivery of papers by Federal Express or other internationally recognized courier service to either Employee's address listed in the Agreement or upon Company at Princess Cruise Lines Ltd., Par La Ville Place, 14 Par La Ville Road, Hamilton, Bermuda HM JX, or (c) 10 days after mailing by postage paid first class mail to either Employee's address listed in the Agreement or upon Company at Princess Cruise Lines Ltd., Par La Ville Place, 14 Par La Ville Road, Hamilton, Bermuda HM JX.

B.  **APPOINTMENT OF ARBITRATOR.** The Parties hereby stipulate to have their dispute resolved by a single arbitrator. The arbitrator shall be agreed upon between the Parties or appointed as set forth below.

1.  The party initiating the arbitration shall serve a notice to arbitrate and propose an individual to serve as arbitrator for the proceedings.

2.  The party responding to the arbitration shall have twenty-one (21) days to respond to the notice to arbitrate and proposed arbitrator. If a party fails to timely respond within said twenty-one (21) day period or fails to timely object to the proposed arbitrator and propose an alternate arbitrator, the proposed arbitrator shall be appointed arbitrator for the matter, unless such person is excluded pursuant to other provisions of this CBA.

3.  If the Parties are unable to agree upon the arbitrator, such arbitrator will be appointed by the Appointments Committee of the Chartered Institute of Arbitrators (Bermuda branch) or failing them, by the Supreme Court of Bermuda.

4.  The Parties stipulate that (i) the arbitrator must be either a licensed attorney, solicitor or barrister in Bermuda or the United Kingdom with at least ten years experience practicing law and experience in arbitration in Bermuda, or a former judge in Bermuda or the United Kingdom; and (ii) that no individual who has either represented the

Companies or has represented anyone making any claim against the Companies in the past ten (10) years shall be eligible to serve as arbitrator.

C. **ARBITRATION PROCEDURES.** Unless otherwise agreed to in writing, the following procedures shall apply to the arbitration.

1. Within twenty-one (21) days of the appointment of an arbitrator, the claimant will serve its points of claim upon the respondent.

2. Within twenty-one (21) days thereafter, the respondent shall serve its defense (if any) and any counterclaim. \

3. Within twenty-one (21) days thereafter, the claimant will serve a Points of Reply to Defense (if necessary) and a Points of Defense to Counterclaim (if applicable).

4. The pleadings will be deemed to be closed fourteen (14) days thereafter.

5. Within twenty-one (21) days thereafter the arbitrator shall hold a preliminary hearing and set an arbitration hearing date.

6. The arbitration shall be held in Bermuda, although attendance may be by telephone or video conference. Each party shall bear their own attorneys fees and costs, except that the arbitrator fees and any fees charged by the Chartered Institute of Arbitrators shall be advanced by the Company. The arbitration shall be conducted in English.

7. The Parties shall provide a copy of all documents which they intend to rely upon during the arbitration proceedings, to the other Party, within 14 days of the close of pleadings. The parties may make reasonable requests for any further documents which are strictly relevant to the issues in dispute and necessary for the proper resolution of those issues, subject to the principle of proportionality, within 14 days thereafter. The arbitrator shall have power to determine the scope of discovery which shall be limited to documents. If either party is asserting any claim for personal injury, then the party against whom such claim is made shall have the right to have the claimant examined by doctors of that party's choosing in specialties relevant to any such claims, and the report of such physicians shall be admissible at arbitration. The parties further agree that each party shall be permitted to seek approval to propound to another party a single document production request, seeking no more than 10 specific categories of documents that are material as evidence in the case

8. The parties shall exchange witness statements within 21 days after the close of pleadings. The statements should briefly set out each Party's evidence, where possible by reference to any supporting documentation.

9. The parties shall serve written submissions within 14 days of the last date provided for the exchange of their witness statements or experts' reports. Reply submissions may be served within a further 14 days. Such submissions should briefly set out the legal issues and how they relate to the facts in dispute.

10. The Parties may agree to conduct the arbitration proceedings on paper only i.e., on the exchange of pleadings, witness statements, written submissions, and other documentary evidence, without oral hearings. In the event that the arbitrator feels that it is necessary to speak with the parties, in order to ask any questions of them, such discussions shall be limited to telephone conference calls, or video conferencing, at a convenient time when both Parties, and their legal representatives, may be present. Both parties shall have liberty to apply to the arbitrator for further directions if necessary.

11. All pleadings, witness statements and written submissions, shall be clear and concise, paginated and contain numbered paragraphs.

12. The arbitrator shall produce a written reasoned award within 28 days after he receives the Party's written submissions or reply submissions if any. The decision of the arbitrator shall be binding with no right of appeal based on an error of law or fact. An award rendered by an arbitrator pursuant to this provision may be entered in any court having jurisdiction under the Convention.

13. The arbitrator shall possess the discretion to extend any timeframes contained herein, where he considers it appropriate. Further, in relation to claims involving death or more than 50% disability, or similar large claim, either party may require a live hearing.

**D.   OTHER PROVISIONS.** The arbitrator and not any court or other body shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this CBA including, but not limited to any claim that all or any part of this CBA is void or voidable. In the event of a determination that this arbitration provision is for any reason in whole or in part unenforceable, Employee agrees that Company may offer, and Employee agrees to accept, any stipulation striking or waiving any provision or part of any provision that is deemed to render this arbitration provision invalid, for the purpose of enforcing the arbitration provision. In the event any Employee Claim or portion of any Employee Claim is deemed not subject to arbitration for any reason, such dispute shall be litigated exclusively in the Supreme Court of Bermuda, and the parties submit to the exclusive jurisdiction of the Bermuda Court for this purpose, to the exclusion of the courts of any other country, state, city or region.

# ARTICLE 15
## Limitation on Representative Actions

Company and Employee agree that this CBA provides for the exclusive resolution of disputes through individual arbitration on Employee's own behalf instead of through any class or representative action or proceeding brought in either arbitration or court. Even if the applicable law provides otherwise, Employee agrees that any action or proceeding against Company whatsoever shall be brought by Employee individually and not as a member of any class or as part of a class or representative action, and Employee expressly agrees to waive his/her right to invoke any law entitling him/ her to participate in a class action.

# ARTICLE 16
## Integration of Terms, Severability

Except as otherwise provided in any other controlling government-mandated contract governing the Employee's employment, this CBA, and the Agreement which fully incorporate this CBA together constitute the sole and entire agreements of the parties. There are no prior or present agreements, representations or understandings, oral or written, which are binding upon either party. Except as otherwise provided herein, no modification or change of these terms shall be valid or binding unless in writing and executed by the party or parties intended to be bound by it. Only an authorized Company representative may modify or change the terms of this Agreement on behalf of the Company. In no event shall this CBA or the Agreement be interpreted as creating anything other than an employment relationship that is terminable at will, upon appropriate notice as set forth in Article 3, above, by either the Company or Employee.

These terms are severable. If any provision or portion of any provision of this CBA is determined to be void or otherwise unenforceable by any arbitrator or court of competent jurisdiction, then the remainder of the terms contained herein shall stand in full force and effect.

# ANNEX I
# The Company Code of Conduct

## A. INTRODUCTION

Since seafaring is an occupation that requires seafarers to spend their working and leisure hours in the confined environment of the ship and in company with the same individuals, the need for appropriate discipline and behavior assumes particular importance. The most effective form of discipline is self-discipline, which in turn springs from a responsible attitude to the job together with a concern for the efficient operation of the ship and for the comfort and convenience of colleagues.

Failures of self-discipline that occur will be dealt with in accordance with the following Code of Conduct containing the basic rules of reasonable behavior expected from all staff.

In any emergency or other situation in which the safety of the ship or of any person on board is at stake, the Captain, Officers, Petty Officers, Managers and Supervisors are entitled to expect immediate unquestioning obedience of orders. There can be no exception to this rule. Failure to comply will be treated as among the most serious breaches of this Code and will likely lead to the offender's immediate discharge from the ship. It may also warrant prosecution.

Emergencies are fortunately rare and this document is primarily concerned with the day-to-day situation on board. It should be borne in mind, however, that certain acts of misconduct (e.g. absence from place of duty or intoxication) could have a very serious effect on the safety of the vessel.

## B. OVERVIEW

1. The Disciplinary Rules and Procedure apply to all ship-based employees of the Company as well as contractors, concessionaires and others performing services onboard Company vessels.

2. The Disciplinary Rules and Procedure covers cases where the employee's conduct is in breach of the Company's Disciplinary Rules (see section C below), including any breach of Company Rules, practices, policies and regulations. The Disciplinary Rules set out at section C below are indicative of the sort of matters which will constitute disciplinary offenses.

3. It is necessary to have a procedure for dealing with breaches of discipline, which is supported by appropriate sanctions. These may range, according to the seriousness of the breach, from verbal warnings for the most minor breaches, through various grades of formal warnings, to discharge from the ship and ultimately, dismissal from employment.

   - Verbal Warning
   - Conduct Advisory Notice
   - Formal Warning
   - Discharge from the Ship
   - Dismissal from the Company

   **Note:** These measures do not have to be invoked sequentially.

   **Note:** Manager and supervisor includes all ranks that have responsibility for organizing and running the day to day activities of more than one member of crew.

   **Note:** Discipline may be handled via the Company shoreside offices if deemed appropriate.

   Disciplinary action may be taken with respect to any conduct which is relevant and/or reflects on service with the Company and/or employment obligations, whether on or off a ship and whether or not an individual is included on the ship's crew list.

   In circumstances where an individual fails to meet performance standards for reasons other than improper conduct, action may be taken under the Performance Management Policy.

4. Employees are subject to the law of the vessel's flag and/or the law of the territory where the ship is at the time of any incident. For certain offenses e.g. conduct prejudicial to the safety of the ship or those on board, Employee may be subject to prosecution in the courts of the vessel's flag and/or the law of the territory.

## C. DISCIPLINARY RULES

### General Conduct

1. You should be familiar with, understand and comply with all applicable Instructions, Procedures, Fleet Regulations, Shore Management Directives and other publications, as are issued from time to time, detailing duties and/or obligations. You must also comply with all relevant external rules and regulations including, but not limited to, Customs Rules, Port Authority, By-laws and Immigration Regulations. Copies of all applicable Instructions, Procedures, Fleet Regulations, and Shore Management Directives, as issued from time to time, are held on board ship and can be inspected upon request to the appropriate Head of Department.

2. You should also ensure the highest standards are maintained with regard to the following:

   a. Service to Passengers: The livelihood of all crew aboard a passenger ship is to a great extent dependent upon the quality of the service provided for passengers. It is of the utmost importance that all on board who are engaged in the provision of this service conduct themselves in a polite, cheerful and helpful manner. Your conduct must be such that it does not invite justifiable adverse criticism from passengers.

   b. Treatment of your colleagues: You must treat your fellow employees and other colleagues in a professional and respectful manner.

3. If an occasion arises when you feel unable to meet the standards set, please go to your Supervisor, Head of Department or Human Resources  Officer and explain your problem. Remember that they want to help and do not want to use the disciplinary procedure if at all possible.

### Gross Misconduct

4. These are acts of misconduct for which discharge from the ship may be deemed appropriate (aside from any legal action which may be called for).

### Misconduct

5. Misconduct (i.e. less than Gross Misconduct) covers a range of lesser offenses, which do not normally constitute grounds for discharge on the first occasion. However, should they occur more than once or, should you, at the time of the alleged commission of the offense, be subject to a verbal warning, conduct advisory notice or formal warning, or should the alleged misconduct arise in conjunction with other offenses, this could result in the matter being dealt with as Gross Misconduct.

## INTERACTION WITH OTHERS (IWO)

### Gross Misconduct:

| | |
|---|---|
| IWO 1-01 | Any altercation or physical assault, attempted or otherwise, such as hitting, slapping, pushing, kicking, holding, impeding, or blocking the movement of another person; |
| IWO 1-02 | Verbal or physical threats toward persons or property; the use of vulgar or profane language toward others; disparaging or derogatory comments or slurs, verbal intimidation, name-calling, or hate speech; |
| IWO 1-03 | Intimidation, bullying, coercion and/or interference with the work of other employees; |
| IWO 1-04 | Conduct of a sexual nature or other conduct based on sex affecting the dignity of women and men at work, which is unwanted, unreasonable and offensive to the recipient; |
| IWO 1-05 | Discrimination, offensive Behavior or victimization towards any person on the grounds of age, gender, colour, race, national origin, ancestry, marital status, religion or belief or sexual orientation; |
| IWO 1-06 | Behavior, which seriously detracts from the social well-being of any other person on board; |
| IWO 1-07 | Participating/assisting in any unauthorized gambling or raffles; |

| IWO 1-08 | Any involvement in activities where money is exchanged and/or money brokering, including private trading of space or merchandise belonging to or being acquired from the Company; |
| IWO 1-09 | Demanding and/or receiving any commission or other favor or benefit from any passenger or customer or supplier or fellow employee (excluding only unsolicited gratuities at a reasonable and appropriate level given by passengers for service provided) including soliciting gratuities or requesting passengers to write to the company in praise of the individual's performance; |
| IWO 1-10 | Initiating, attempting to initiate, or engaging in intimate relations with a passenger; |
| IWO 1-11 | Possession of pornographic material depicting minors, violence or particularly obscene content; |
| IWO 1-12 | Communicating in an inappropriate manner with minors (including any communication via social networking sites); and/or photographing of minors onboard or ashore. |

**Misconduct:**

| IWO 2-01 | Offensive or disorderly Behavior; |

## PERFORMANCE RELATED ISSUES (PRI)

**Gross Misconduct:**

| PRI 1-01 | Persistent or willful failure to perform duty; |
| PRI 1-02 | Serious negligence in the performance of duty; |
| PRI 1-03 | Serious neglect of courteous service or behavior towards ship's passengers or other guests; |
| PRI 1-04 | Absence without leave at the time of sailing; Desertion |
| PRI 1-05 | Insubordination or willful failure to comply with instructions given by supervisor and/or officer. |

**Misconduct:**

| PRI 2-01 | Minor acts of negligence, including neglect of duty and disobedience; |
| PRI 2-02 | Unsatisfactory work performance; |
| PRI 2-03 | Poor time keeping, failure to report to work without satisfactory reason, stopping work before the authorized time and/or returning on board after shore leave has expired; |
| PRI 2-04 | Failure to maintain accurate records of Hours of Rest |
| PRI 2-05 | Failure to maintain the required standards hygiene, uniform or appearance; |

## TREATMENT OF THE SHIP OR OTHER PROPERTY (TSP)

**Gross Misconduct:**

| TSP 1-01 | Willful damage and/or wastage to the ship or any Company property; |
| TSP 1-02 | Theft (including attempted theft) or possession of stolen property; |
| TSP 1-03 | Any illegal or unauthorized use or modification of keys or key cards |

**Misconduct:**

| TSP 2-01 | Failure to maintain living accommodation to an acceptable standard; |
| TSP 2-02 | Misuse of Company Computers and/or breach of Company Computer Security Policies. |

Employment Agreement • 05.01.17

**HEALTH SAFETY AND SECURITY (HSS)**

**Gross Misconduct:**

HSS 1-01    Incapacity through the influence of alcohol to carry out duty to the prejudice of the safety of the ship or of any person on board or any other breach of the Company's policy on alcohol;

HSS 1-02    Incapacity through the influence of drugs, while onboard or ashore, to carry out duty to the prejudice of the safety of the ship or of any person on board or any other breach of the Company's policy on drugs;

HSS 1-03    Failure to pass or to comply with a demand  for an alcohol or drug test;

HSS 1-04    Unlawful or willful use, possession or distribution of illegal drugs, including, prescription drugs which are prescribed to someone else;

HSS 1-05    Possession of a weapon;

HSS 1-06    Behavior, which seriously detracts from the safe and/or efficient working of the ship;

HSS 1-07    Conduct which could endanger the ship or persons or cargo on board, including the failure to report accidents, injuries and unsafe conditions aboard the ship;

HSS 1-08    Disobedience of orders relating to the safety or security of the ship or cargo or any person on board;

HSS 1-09    To be asleep on duty or fail to remain on duty if such conduct would prejudice the safety or the security of the ship or cargo or any person on board;

HSS 1-10    To use a naked light or an unapproved electric torch in any part of a ship carrying dangerous goods or stores where the use of naked lights or unapproved torches is prohibited;

HSS 1-11    Failure to observe proper safety procedures when and/or where required to do so, including the contravention of Watertight Door procedures;

HSS 1-12    Persistent and or/willful failure or refusal to wear and/or use safety equipment and/or clothing and/or observe proper safety procedures when and/or where required to do so;

HSS 1-13    Causing or permitting unauthorized persons to be on board the ship;

HSS 1-14    Deliberate misuse of security or landing passes or Company identity cards, and/or deliberate avoidance of security procedures;

HSS 1-15    Impeding or conspiring with others to impede the progress of the voyage or navigation of the ship;

HSS 1-16    Failure to adhere to the instructions of the Medical Department in relation to the treatment or management of any infectious/contagious illnesses, or submit to vaccination or treatment as required for public health;

HSS 1-17    Failure to comply with the Company Food Safety Policy or Public Health Policy.

HSS 1-18    While ashore, operating any type of motor vehicle, including, but not limited to, cars, motorcycles, and mopeds, while intoxicated or deliberately riding in or on a motor vehicle operated by an intoxicated person;

HSS 1-19    Failure to comply with the Company's Smoking Policy;

HSS 1-20    Participating in dangerous sports or other activities that the Company has directed that crew not participate in. Not following rules laid down for participating in activities, i.e., wearing helmets;

HSS 1-21    Hampering or impeding an investigation by failing to fully cooperate or by any other means.

**Misconduct:**

HSS 2-01    Losing or failing to display or present on demand a Company identity card, security or landing pass;

HSS 2-02    Failure to maintain the required standards of personal cleanliness or hygiene;

**HSS 2-03**   The unauthorized consumption of food, or the purchasing/taking of food from the galley or food service area, with the intention of consuming within cabins or other unauthorized areas; or unauthorized cooking in any place onboard;

**HSS 2-04**   Failure to join a vessel with original documents of Certification without prior authorization from Human Resources;

**HSS 2-05**   Use of personal cellphone or other electronic device during the course of one's regular duties;

**HSS 2-06**   Minor Public Health policy infraction.


## OTHER BREACHES (OBR)

**Gross Misconduct:**

**OBR 1-01**   A breach of a lesser degree covered under Misconduct after a formal warning has been given;

**OBR 1-02**   Breach of Customs, Immigration, Agriculture or Quarantine regulations;

**OBR 1-03**   Breach of the Company Environmental Policy or Procedures, and any related legislation;

**OBR 1-04**   Unauthorized dumping of garbage and/or the disposal of any material whatsoever over the side of the ship;

**OBR 1-05**   Contravention of procedures designed to avoid polluting the environment;

**OBR 1-06**   Making or distributing false or malicious statements or disclosing confidential information to employees or passengers.

**OBR 1-07**   Giving interviews/passing comments to the press/media without the Master's permission;

**OBR 1-08**   Any breach of or abuse of the Company's Policies and/or Procedures, as amended from time to time;

**OBR 1-09**   Unauthorized presence in passenger areas, and/or the unauthorized accompaniment and/or invitation of passengers into crew areas;

**OBR 1-10**   Bringing or having on board any birds, pets or livestock of any kind;

**OBR 1-11**   Supplying false or misleading information when applying for employment and/or at any time during employment including, but not limited to, any false or misleading statement or deliberate concealment of facts regarding any current, past or preexisting medical condition;

**OBR 1-12**   Altering or falsifying and/or causing any other person to alter or falsify any Company documentation ;

**OBR 1-13**   A breach of the Carnival Corporation & plc Code of Business Conduct and Ethics;

**OBR 1-14**   Violation of the Company's Internet Policy;

**OBR 1-15**   Smuggling

**Misconduct:**

**OBR 2-01**   Persistent or willful failure to settle any shipboard personal account, or presenting any personal cheque(s) on board, without first ensuring sufficient funds are available in their personal account to cover their withdrawal;

**OBR 2-02**   Failure to conform to the ship's rules concerning the bringing of alcohol on board;

**OBR 2-03**   Minor breaches of Standing Orders.

**General**

6.   The Company reserves the right to amend this Code of Conduct in its absolute discretion from time to time.

## D.  DISCIPLINARY PROCEDURE

**Scope**

1.   The Disciplinary Procedure set out below in this Section D is discretionary on the part of the Company and subject to change without notice.

2.   The Company reserves the right not to apply the Disciplinary Procedure in particular circumstances. For example, the Disciplinary Procedure may not normally apply to

   a.   An employee serving his/her probationary period of employment; or

   b.   A fixed term worker on a short duration engagement;

   c.   Any other situation where the individual circumstances of the particular case in the discretion of the Company do not lend themselves to the structure of this Disciplinary Procedure.

3.   All Supervisors, relevant Two and Three Stripe Officers and/or Heads of Department involved in exercising the Disciplinary Procedure are deemed to be authorized to do so by the Master and the rank of any officer so authorized shall be entered by the Master in the official log book.

4.   A disciplinary offence shall be dealt with within 24 hours of the time it comes to the notice of the Master unless it is not practicable to deal with it within that time, in which case it shall be dealt with as soon as practicable thereafter.

**Suspension**

5.   The Company reserves the right to remove you from duty at any stage of the Disciplinary Procedure subject to your Terms and Conditions of Employment. It is within the master's right to arrest, confine or restrain a crewmember on the ship and/or to a cabin.

**Disciplinary Hearing**

6.   Where a matter is referred to the relevant Two or Three Stripe Officer, Head of Department, or Master, you will be informed in writing of the particulars of the alleged breach and invited to attend a hearing at a designated time and place. You have the right to be accompanied at this hearing in accordance with paragraphs 14-15 below.

7.   Provided it is reasonable under the circumstances, you will be permitted to call witnesses to give evidence and to question any witnesses called by the Company. All evidence shall be heard in your presence.

8.   Without prejudice to the above, the Two or Three Stripe Officer, Head of Department or Master will adopt the procedure considered appropriate to the case.

9.   If it is concluded that there was misconduct, the penalty imposed will be as is considered reasonable under the circumstances, taking into account your disciplinary record and any other relevant factors. The Two or Three Stripe Officer, Head of Department, or Master may decide to:

   a.   Issue a Verbal Warning;

   b.   Issue a Conduct Advisory Notice

   c.   Issue a Formal Warning;

   d.   Discharge you from the ship.

These measures do not have to be invoked sequentially. The measure which is imposed is at the discretion of the Two or Three Stripe Officer, Head of Department, or Master and will reflect the severity of the offense and all other relevant circumstances.

10. You will be presented with a copy of all entries made in the Official Log Book relating to your misconduct. Names or other personal information may be redacted for safety reasons. You will acknowledge receipt of the same.

11. Where practicable, all proceedings will be conducted and a conclusion reached onboard the ship. However, where this is impracticable, the proceedings may be referred to shore Management at the Master's discretion.

### Discharge From Ship

11. You have the right to appeal against a decision to discharge you from the ship. Your request for reinstatement should set out the basis for your appeal and be received within 30 days from the date of your discharge.

### Misconduct Ashore

13. You continue to be subject to the Terms and Conditions of this CBA and the Code of Conduct while ashore so long as you remain entered on the vessel crew list.

### Right To Be Accompanied/Represented At Disciplinary Proceedings And Appeals

14. During the investigation, you have the right to be accompanied/assisted by a fellow worker or a trade union representative. You are responsible for making the necessary arrangements for a companion to attend any hearing and the physical presence of any companion must be reasonable under the circumstances and not cause undue delay in resolving the matter.

15. Your representative may make statements on your behalf but will not be permitted to answer questions addressed to you.

### Failure To Attend A Hearing

16. You are required to take all reasonable steps to ensure you attend.

17. A decision may be taken in your absence if you unreasonably fail to attend a hearing.

### General

18. If a warning is issued, the individual will be required to sign the document to confirm that they have received it. Your signature does not signify your agreement, only that you have received the document. You may choose to add your own comments if you disagree with the sanction issued. If an individual refuses to sign or accept receipt then the document will be endorsed to that effect.

19. It is your responsibility to ensure that you have read and understood this policy.

20. If you have any queries whatsoever relating to the Disciplinary Rules and Procedure, you should ask your Supervisor, Head of Department or Human Resources Officer, or if ashore, your Manning Office for assistance.

21. The Company reserves the right to add to, remove or amend the Disciplinary Rules and Procedure at any time.

22. Nothing in this process removes your right to seek redress under other provisions of your employment agreement.

# ANNEX II
# Onboard Complaints Procedure

To avoid persons taking matters into their own hands, it is essential to have a procedure for dealing with complaints which enables a complainant with a genuine grievance to bring it, simply and quickly, to the notice of a person in authority.

1. A complaint will normally be made individually by the person who feels he/she has a genuine grievance, to their immediate Supervisor. The complaint may be verbal or in writing.

2. If the complainant considers that his/her complaint has not been satisfactorily addressed by the supervisor, or if the complaint relates to the supervisor, he/she has the right to request to see the Head of Department or Human Resources Officer. The Human Resources Officer may, on a confidential basis, provide impartial advice on a complaint or otherwise assist with the complaints procedure.

3. It will then be the duty of the Head of Department or the Human Resources Officer to interview the complainant with the Supervisor. If the complainant is still not satisfied, he/she has the right to request to see the Captain. The Head of Department will arrange for this. In appropriate circumstances, Head of Department or Human Resources Officer may refer a complainant to the Captain.

4. This procedure does not preclude a member of the crew from making a request to see the Head of Department on any private matter, but it must be understood that if it is considered that the matter is one which should have been dealt with at a lower level, instructions will be given that this course must be followed. While complaints should be dealt with at the lowest possible level, the seafarer has a right of direct approach to the Captain if his/her complaint is not satisfactorily resolved.

5. Additionally, crewmembers can report complaints or any areas of concern by contacting the Compliance Hotline, dialing 1-800-872-6779 ext 31550 for the shoreside legal department, or through any other established procedure.

6. Crewmembers on Bermuda flagged ships may contact the Bermuda Maritime Administration at complaints@bermudashipping.bm and crewmembers on UK flagged ships may contact the Maritime & Coastguard Agency at mlc@mcga.gov.uk. Crewmembers may also contact the competent authority in their country of residence which can be located by referencing http://www.imo.org/en/OurWork/Facilitation/docs/Pages/default.aspx and selecting/clicking the pdf document labeled FAL.5-Circ.38.

7. Any complaint must be in writing, include all particulars of the complaint, and be made within 3 months of the final failure onboard to achieve resolution.

8. A complaint concerning compliance with the Maritime Labour Convention and which has not been effectively dealt with under this Procedure may be made to an authorized port state control officer.

9. While onboard, the complainant may be accompanied or represented, if he/she so wishes, by an individual of his/her choosing when discussing a complaint.

10. Upon receipt of a complaint, an assessment will be made regarding the specifics of the issue raised. If the relevant parties are still on a vessel, and dependent upon the nature and severity of the complaint, the Captain and/or Human Resources Officer will be notified.

11. If the complaint requires investigation, the Human Resources Officer may conduct the investigation onboard, in collaboration with the appropriate shipboard and shoreside departments. In certain instances, the investigation may be conducted by shoreside personnel and communicated to the Legal Department and/or the Captain.

12. Use of the Onboard Complaints Procedure does not prejudice the crewmember's ability to seek redress under the provisions set forth in his/her employment agreement, and/or Collective Bargaining Agreement and/or Government Mandated Contract.

13. No one making a complaint in good faith and in accordance with the foregoing procedure will be penalized in any way for making the complaint.

# ANNEX III
# Dress Code: Appearance, Personal Cleanliness And Hygiene

The following outlines the Appearance Policy as it applies to members of the ship's company onboard any vessel. The objective is consistency. All Employees regardless of their position are required to maintain a clean and professional image at all times. You agree to read the Personal Appearance and Hygiene policy carefully. As a valued member of the ship's company, it is very important that you understand these guidelines.

By performing your duties in a uniform, which you wear with pride, and by having a personal appearance that reflects our image as the leader in our industry, you help to create the kind of professional atmosphere we strive to present.

We would also like you to understand that you are part of a very unique team at sea, a team that has been handpicked from among numerous applicants. Without you we would not be able to provide the unique experience it is to cruise on any of our vessels. We rely on you to continue to make us as successful as we are. The following dress and appearance guidelines apply.

1.   **UNIFORM** - Your uniform helps to create a good impression.

   **A.**   Uniform, together with the appropriate shoes, is to be worn at all times when on duty. Uniform is to be spotlessly clean and neatly fitting. It must also be properly pressed at all times and maintained in good condition. No objects are to be carried in pockets where they are visible.

   **B.**   **Pins:** The only pins, buttons and decorations that can be worn on a uniform are those approved by the company. Name badges are to be worn by all members of the ship's company. Only a Company issued name badge is to be worn. Only a Company issued foreign flag (if applicable) may be worn.

   Name badge and the company's designated customer service pin are to be worn at all times when on duty. These are to be in good condition, worn in the grommets provided for the name badge on the uniform. If no grommets are provided the name tag is to be on the left chest over the heart, horizontal. The company's designated customer service pin is to be approximately half an inch above the name badge. Decorations on your name badge are not permitted. Name badges are not to be worn on Galley uniforms.

   **C.**   **Shoes:** Must always be clean, polished, in good repair and should be practical and safe for the workplace. Conservative styles only are to be worn.

   **Women's Shoes And Hosiery:** Female members of the ship's company are required to provide their own leather, pump or flat shoes with a plain toe and a defined or sculpted heel. For safety considerations, Stiletto heels are not permitted and the maximum heel height cannot exceed 2.5 inches (6.35 cm). Shoes are to be polished and in good repair. Platform shoes and sandals or open toe/heel shoes are unacceptable. It is required that rubber soled shoes are worn in food and beverage preparation areas as well as housekeeping and behind the scenes areas, as a safety precaution.

   **Hosiery:** When hosiery is worn, it is to be of a natural skin/ nude color, which is as close, as possible, to the members of the ship's company's own skin color. If a navy or black skirt or dress is part of the uniform, navy or black hosiery corresponding in color to the uniform item is acceptable.

   **Men's Shoes And Socks:** Male members of the ship's company are required to provide their own leather flat shoes with a plain toe. Platform shoes, sandals or high tops are not acceptable. It is required that rubber soled shoes are worn in food and beverage preparation areas as well as housekeeping and any safety sensitive area, where shoes can be used as a safety precaution. Socks are to be provided by the members of the ship's company.

   The color of the socks worn should correspond with the color of the company issued trousers with no logos or designs allowed.

   **D.**   Although dirty jobs are performed, every effort is to be made to remain clean and smart at all times.

   **E.**   Where required, safety shoes and clothing must be worn at all times and appropriate safety equipment used.

F. **Skirt Lengths:** When a formal uniform with a full-length skirt is worn, it should be no longer than ankle- length. Other skirt lengths are to be worn in-between two inches below or at knee length. Formal tuxedo trousers may be permitted in lieu of a skirt as long as the overall look does not detract from an elegant appearance and is deemed appropriate by the relevant head of department.

G. **Sunglasses:** Sunglasses are not to be worn by any members of the ship's company. The exception to this rule is if the member of the ship's company is prevented from doing his/her job safely, due to sun glare from water, countertops etc. The sunglasses worn cannot have silver coated or dark opaque lenses that do not allow for the eyes to be seen. Mirrored sunglasses are unacceptable.

H. **Uniforms off The Ship:** Members of the ship's company are not allowed to wear their uniform while off duty and off the ship. Members of the ship's company on duty and working off the ship are required to wear their uniform.

2. **HAIR/MAKE-UP**

A. All members of the ship's company are to maintain a neat, natural look. Hair is to be clean at all times. Members of the ship's company are to keep their hair neatly combed and arranged in a classic, easy-to-maintain style at all times.

B. Extreme styles are unacceptable. As are: Hair extensions, wigs, and hairpieces.

C. It is unacceptable to wear hairstyles with extremes in dyeing, bleaching and coloring. Extreme frosting and streaking is unacceptable. If the hair color is changed, it must be natural looking and well maintained. Excessive use of hair gel to make hair look "wet" is unacceptable.

D. Hair must be dried after washing and before coming to work.

E. **WOMEN**

Hair Accessories for Females: All hair accessories for female members of the ship's company are to be kept at a minimum and at no time exceed three pieces. The hair accessory is to be in a color that reflect the uniform or in gold, silver, clear or black. The accessory is to be of a size that is no wider than one inch. A hair accessory is to be used for the sole purpose of keeping the hair away from the face and not as a decorative addition to the uniform

**Makeup:** We encourage the use of makeup to enhance natural features and create a fresh, natural appearance. The excessive use of makeup or use of makeup in offensive colors is discouraged.

**Foundation:** Foundation base should be in a shade complimentary to the natural skin tone. Application should be well blended in order to achieve a natural look and to avoid stains on uniforms. All makeup should be carefully applied and tastefully worn to accentuate the professional appearance.

Hair must be worn in a neat, attractive and conservative style. Female staff working in the Dining Room or food service outlets are to ensure hair is worn up and off of the shoulders and away from the face. Female Galley staff are to wear their hair, if long, tied back and covered with a hair net.

Only neutral shades of nail polish are to be worn. For USPH reasons nail polish is not permitted to be worn by female staff working in the Galley.

F. **MEN**

Hair must be neatly groomed and conservatively styled.  No exaggerated (excessively sculptured) styles permitted.  Hair product may be used to create a soft, natural hairstyle within these guidelines. Hair on men is to be no longer than the top of the collar.

Sideburns should be neatly trimmed and are permitted to extend beyond the midpoint of the ear, but not below the ear lobe, following their natural contour. Flares or muttonchops are unacceptable.

Mustaches and goatees are acceptable, provided they are neatly trimmed and well maintained. The process of growing facial hair while onboard is not allowed. Men must be clean-shaven at all times; hair stubble due to lack of shaving is unacceptable while on duty – it may be necessary for some men to shave more than once per day.

Note: Officers, deck and technical ratings and hotel staff in non-passenger areas may wear a neatly trimmed beard, long side-burns and/or a mustache, but only with the permission of the Head of Department. The Company will consider departures from the provisions of this policy based on sincerely held religious beliefs.

3.  **JEWELRY**

   **A.**  Jewelry is not a part of your uniform. Small rings, class rings, wedding bands, conservative tie clips, and a business style watch are permitted, except in food handling areas where only a wedding band is allowed. A small ring is defined as the same size or smaller as a man's class ring. A ring may be worn on any finger. Only one ring per hand is allowed. Visible necklaces, chains, pendants, logos, bracelets, ankle bracelets, wristbands, and arm bands are all unacceptable. A medical alert necklace, bracelet or ankle bracelet is acceptable.

   **B.**  Earrings – Female: One single earring in each ear lobe is acceptable. No other visible piercing is acceptable. The earring must be simple, matched pair in gold, silver or color that blends with the uniform. The shape of the earring must be in good taste and compliment the uniform. The earrings can be pierced or clip-on and must be worn on the bottom part of the ear lobe. Multiple earrings are unacceptable. Earrings cannot be any larger than the size of a US quarter.

   **C.**  Males: It is unacceptable for male members of the ship's company to wear earring/s when on duty and in uniform.

   **D.**  Body Piercing: Face body piercing such as nose, tongue and eyebrows, but not limited to, are not acceptable when on duty or when Employees are in passenger areas.

4.  **TATTOOS**

   **A.**  Princess Cruises recognizes that personal appearance is an important element of self-expression, and though we strive not to control or dictate employee appearance whilst off duty, the Company expects all employees to exercise appropriate judgment. Appearance both within the workplace and out should be in keeping with a respectful environment and appropriateness to our guest demographic.

   **B.**  In keeping with this approach, Princess Cruises allows reasonable self-expression through the display of tattoos, unless a) for passenger facing crew; it detracts from the uniform appropriate to the role or b) it is regarded as offensive or harassing toward co-workers, guests or others with whom the employee may come into contact. The following tattoos are examples of those not permitted; Skulls, Daggers, Guns, General Weapons, potentially offensive or obscene words, phrases or pictures, Full 'sleeve' tattoos on either the arms or legs. These examples are not exhaustive.

   **C.**  Employees are not permitted to have tattoos applied or modified whilst on assignment and any Employee found to do so will be subject to disciplinary action. Any tattoos on hands (except for religious observance) or above the neck-line, including the face and behind the ear, are prohibited.

   **D.**  Discreet tattoos may be acceptable, provided they are not in violation of the above guidelines.  These are subject to the discretion of the relevant Head of Department or shoreside Human Resources.

   All individuals employed by Princess Cruise Lines must declare all potentially visible tattoos based on the uniforms that they may wear based on their current rank for all seasons/itineraries. This may include the wearing of shorts and short sleeve shirts. While tattoos that can be covered by applying make-up or small plaster (5 cm x 5 cm) may be allowed, larger bandages that cover sleeve or lower limbs are not in keeping with the uniform and are therefore not acceptable.

   **Shipboard management has the discretion to determine whether a tattoo is prohibited.**

5.  **PERSONAL HYGIENE**

   **A.**  Regular attention is to be paid to hygiene by showering regularly at least once a day and by use of suitable deodorants including underarm deodorants, however these are not to be strongly scented (to prevent body odor, bathing may be necessary more than once a day). All uniforms are to be changed daily, prior to going on duty.

   **B.**  Perfume, Cologne, After Shave: Due to close contact with others it is discouraged to use strong heavy scents and fragrances. If perfume, cologne or after-shave is used it should be of a mild scent and used moderately.

**C.**   Fingernails: should be kept clean at all times, well-trimmed and of moderate length. If polish is used, it should be of a clear or cream color (color of the skin). Polishes that are red, dark, bright, gold or silver are unacceptable. Fingernails should be neatly trimmed. Fingernail decorations, pins, stencils etc. are unacceptable.

**D.**   Oral Hygiene: Bad breath is unpleasant for others. Regular oral hygiene and the use of mouthwash are strongly recommended to avoid offending.

**E.**   Strict attention is to be paid to the ship's and USPH rules on hygienic working practices.

**F.**   Staff feeling unwell and/or having open cuts and sores, are to immediately seek medical attention. Disciplinary action will be taken against staff who infect others by failing to seek medical attention under such circumstances.

## 6.   NON UNIFORMED MEMBERS OF THE SHIP'S COMPANY

Onboard some of our vessels you will encounter members of the ship's company who do not wear prescribed company uniforms. In the business world of today, how members of the ship's company look and present themselves, says a lot about the company for which they work. A professional appearance is essential to a favorable impression with passengers, vendors and colleagues.

Our non-uniformed members of the ship's company, are guided by our uniform and grooming policy.  Basic elements for appropriate and professional business attire include clothing that is in neat and clean condition. Basic guidelines for appropriate workplace dress do not include tight or short pants, tank tops, halter tops, low-cut blouses or sweaters, or any extreme style or fashion in dress, footwear, accessories, fragrances or hair.

Non uniformed members of the ship's company are required to wear a name badge and the company's designated customer service pin at all times when on duty.

## 7.   MEDICAL EXCEPTIONS

Any request for medical exceptions to the appearance policy, such as shoes, hairpieces, not shaving due to a skin irritation, etc, must be presented to the ship's doctor for consideration. The department head's approval is required for medical exceptions after receiving the doctor's recommendation.

It is the responsibility of each individual Employee to adhere to the above Company guidelines. Department managers may exercise reasonable discretion to determine appropriateness in employee dress and appearance. If a supervisor or manager decides that an employee's dress or appearance is not appropriate as outlined in this policy, he or she may take corrective action and require the employee to leave the work area and make the necessary changes to comply with the policy.

Violations regarding any of the above guidelines may lead to disciplinary measures being taken pursuant to the Code of Conduct.

# ANNEX IV
## Policy Against Harassment and Retaliation

It is Company policy that employees shall not be subjected to harassment or retaliation. Accordingly, we will promote and maintain a work environment free from all forms of harassment and retaliation while insisting that all employees be treated with dignity, respect and courtesy. Harassment or retaliation occurring in the workplace or in connection with work is counterproductive to the organization and will not be tolerated.

This policy applies to all members of staff. The Company will make every effort to ensure that everyone is familiar with this policy and understands that the Company will investigate thoroughly and resolve appropriately any complaint of harassment or retaliation.

1. **Guideline**

   The following discussions of what may constitute harassment and retaliation are simply guidelines and are not exhaustive definitions. You are encouraged to consult with your Supervisor, Manager, Human Resources Officer or a Head of Department regarding any question you have about harassment or retaliation.

2. **Harassment Definition**

   The Company considers that harassment can be any action directed at a person on the basis of their gender, sexual orientation, gender identity or expression, marital status, physical or mental disability, race, ancestry, ethnic or national origin, religion, or age regardless of the perpetrator's motives, which a reasonable person would find offensive, including:

   - Visual conduct, including leering, making sexual gestures, displaying of sexually suggestive objects or pictures, cartoons or posters;

   - Verbal conduct, such as sexually-oriented verbal kidding, teasing or jokes, repeated offensive sexual flirtations, advances or propositions, derogatory comments, epithets, and jokes, verbal abuse of a sexual nature, verbal comments about physical appearance, sexual activity, suggestive or obscene letters, notes or invitations;

   - Physical conduct, such as touching, pinching, brushing up against another's body, or impeding or blocking movements;

   - Posting, forwarding, showing or displaying in any manner cartoons that make fun of any group, religious belief, sex, or individual because of his or her protected status;

   - Any other conduct of a nature which may interfere with an individual's work performance or create an intimidating, hostile or offensive working environment;

   - Any attempt to penalize or punish a person for rejecting or objecting to the actions described above.

   The ship's company is advised that any unwelcome physical contact, sexual advances or similar objectionable actions with a fellow crew member may be considered a violation of this policy and grounds for discharge, whether or not the conduct is severe or pervasive enough to rise to the level of unlawful conduct in the eyes of the law.

   Individuals who experience harassment should make it clear to the offending party that such behavior is offensive. If the behavior continues, or if they are uncomfortable expressing their feelings directly, it should be brought to the attention of their Supervisor, Manager, Human Resources Officer, or a Head of Department.

3. **Two Kinds of Sexual Harassment:**

   Quid pro quo: Comes from the Latin meaning "this for that." This occurs when you are either offered some tangible favor or benefit or your working conditions are threatened, based on your response to requests/demands for these favors ("You'll get a promotion if you...")

   Hostile Work Environment: Unwelcome sexual conduct sufficiently severe, persistent, or pervasive so as to affect an employee's performance negatively and/or create an intimidating, hostile or otherwise offensive environment.

The recipient's perception – not the harasser's intent – is the standard by which conduct is measured.

### 4. No Victimization or Retaliation

No crew member should be subjected to victimization or retaliation for reporting, or expressing opposition to, any perceived incident of harassment. Employees are expected to report truthfully and accurately any instances of perceived harassment which they experience directly or which they observe and they are expected to fully participate truthfully and accurately in any investigation on these topics conducted by the Company.  Anyone engaging in victimization or retaliation is subject to dismissal.

### 5. Relations with Passengers

There is no such thing as allowable intimate relations with passengers, whether welcome or not. Any intimate relations or attempts at intimate relations – this includes asking a passenger to be alone, kissing, engaging in sexual relations, or any other similar behavior - will lead to discharge. This is prohibited at any time so long as the crew member is signed on to the crew agreement and covers conduct both on the ship and ashore. Such conduct may also be considered a criminal assault and lead to the arrest of a crew member.

Passengers are not to be invited to an officer/crew accommodation or area, nor should an officer/crew member visit a passenger cabin, unless required to do so in connection with their official duties. Officers/crew in passenger cabins likewise may not invite a passenger into their cabin. The exception to this section is where a passenger is already recognized to be in a relationship with an officer/crew member prior to boarding the vessel. The officer crew member must declare this to their Head of Department prior to the passenger boarding.

Complaints are received from time to time from passengers and others about forms of harassment onboard. In most cases, particularly those involving sexual harassment, there is no actual intent to harass and the complaints arise from misunderstandings caused by different cultural practices and standards. A kiss on the cheek, for example, may be perfectly acceptable in one culture but completely unacceptable in another. Strict adherence to the above rules is for the protection of the officer/crew member.

### 6. Reporting Harassment

The Company complaint procedure allows crew the ability to establish a complaint verbally or in writing.

- An informal complaint is usually made verbally to one's Supervisor, the Human Resources Officer, or Head of Department.

- A formal complaint is documented in writing and submitted to the Human Resources Officer or by calling 1-800-872-6779 Extension 31550 (within the United States) or +1-661-753-1550 (for international calls).

All managers and supervisors are responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise, and are required to report all complaints. Employees are expected and encouraged to inform others in the workplace whenever their conduct is unwelcome, offensive, in poor taste, or inappropriate. Employees who believe they have been subjected to or witnessed any conduct prohibited by this policy are expected to report the conduct to their supervisor, Human Resources Officer, Head of Department, or ashore in the manner stated above. All complaints will be followed by a fair, complete and timely investigation. Confidentiality will be maintained throughout the investigatory process to the extent consistent with adequate investigation.  If it is determined that the alleged harasser has violated policies, appropriate corrective action will be taken in accordance with the Company's Disciplinary procedure, which may include discharge.

### 7. False Harassment Allegations

No person will suffer any adverse employment consequences as a result of a good faith report under this policy. The Company vigorously defends its crew members' right to work in an environment free of harassment and retaliation. The Company also recognizes that false accusations or providing false information in the course of a Company investigation can have serious consequences. Accordingly, any individual who is found, through the investigation process, to have falsely accused another person of harassment or retaliation or to have provided false information to the Company during an investigation may be subject to appropriate disciplinary action, up to and including discharge.